**TEXAS & NEW ORLEANS RAILROAD COMPANY, Appellant,**

v.

**HOUSTON BELT & TERMINAL RAILWAY COMPANY et al., Appellees.**

No. 13144.

Court of Civil Appeals of Texas.

Houston.

Dec. 12, 1957.

Rehearing Denied Jan. 9, 1958.

Finis E. Cowan and Tom M. Davis, Houston, Baker, Botts, Andrews & Shepherd, Houston, of counsel, for appellant.

Fulbright, Crooker, Freeman, Bates & Jaworski and Quentin Bates, Houston, for appellees.

BELL, Chief Justice.

The Texas and New Orleans Railroad Company, hereinafter called Texas, brought this suit against Houston Belt & Terminal Railway Company, hereinafter called Belt, the Missouri-Pacific Railroad Company, hereinafter called Missouri, the Chicago, Rock Island and Pacific Railroad Company, hereinafter called Chicago, the Gulf, Colorado and Santa Fe Railway Company, hereinafter called Santa Fe, and the Ft. Worth and Denver Railway Company, hereinafter called Ft. Worth, for the purpose of securing a judicial construction of an agreement entered into November 18, 1929, between Texas, I. & G. N. and San Antonio & Aransas Pass Railroad Company, hereinafter called San Antonio. Missouri is the successor company to I. & G. N. and it has admittedly succeeded to the rights of I. & G. N. under the contract. In 1934 Texas became successor to San Antonio. The suit was brought for a declaratory judgment under Article 2524–1, Vernon's Revised Civil Statutes of Texas.

On December 26, 1926, the Interstate Commerce Commission, hereinafter called I. C. C., authorized Texas to acquire "control of * * * by lease" certain named railroads, including San Antonio, which was then under lease to Galveston, Harrisburg and San Antonio Railway Company. This lease was assigned to Texas. Under the lease to Texas, effective March 1, 1927, the property of various railroads referred to in the December order of the I. C. C. was leased to Texas. Too, the lease by G. H. & S. A. of the property of San Antonio was transferred by G. H. & S. A. to Texas. G. H. & S. A. assigned "its leasehold interest in the lines of railway and other properties" of San Antonio, together with "its interest in all trackage rights, operating agreements, and other contracts of every description pertaining to the properties so leased from" San Antonio. From such time Texas became the sole operating line for properties of San Antonio and operated over tracks of San Antonio solely for its own account. Thereafter San Antonio never operated any equipment over any trackage. This lease continued until Texas actually became owner of San Antonio's property in 1934.

On August 12, 1929, San Antonio, the owner of certain trackage in the City of Houston, which was wholly operated by Texas, applied to the I. C. C. for a certificate of public convenience and necessity authorizing it to construct an eastern extension of its track south of and along Buffalo Bayou.

Thereafter, on September 4, 1929, I. & G. N. filed its application with I. C. C. seeking authority to extend its tracks through the area which would be served by the extension of San Antonio's track. I. & G. N. intervened in the proceeding by San Antonio and opposed the application of San Antonio.

I. C. C. referred both applications to the Railroad Commission of Texas for hearing, and on hearing San Antonio, Texas and I. & G. N. filed an amended application in which it was stated that the applicants had entered into an agreement under which through their joint undertaking, trackage would be constructed and operation carried on jointly as provided in the agreement. The applicants asked that such agreement, which is the agreement we are called upon to construe, be approved. The agreement was approved by the I. C. C.

The agreement which was approved by I. C. C. and which was the basis of the issuance of certificates of convenience and necessity to San Antonio, Texas and I. & G. N. makes the following provisions which are relevant to this appeal:

1. San Antonio agreed to construct an industrial lead track from the track of

Trinity Portland Cement at or near the intersection of Foley and North Hutcheson Streets in an easterly direction along Foley Street to Milby Street, thence across private property to Lockwood Drive, a total distance of approximately 3700 feet. The right of way was to be obtained by San Antonio, and it was to pay the cost of constructing this industrial lead track. The rights with regard to this extension are the subject of dispute in this proceeding.

2. I. & G. N. was to renew its industrial lead track from a point near its intersection with Commerce Street and extend it to the west line of the Cement Company property.

3. The Cement Company had a track through its property and I. & G. N.'s track connected with it on the west and the proposed extension by San Antonio would connect with it on the east. The Cement Company had given I. & G. N., San Antonio and Texas the right to use this track.

4. The portion of the track to the east of the Cement Company property was to be maintained by San Antonio, but the cost of maintenance was to be shared by I. & G. N., such cost to be apportioned on the basis that the number of cars in any one month handled for I. & G. N. bore to the whole number of cars handled over the track. Too, I. & G. N. was to pay in monthly installments as rental 1⁄12th of 3% per annum on the appraised value of such track, and was to pay 1⁄2 of any taxes.

5. On the track to the west of the Cement Company trackage, which belonged to I. & G. N., all maintenance work was to be done by I. & G. N., but San Antonio (actually Texas) was to pay its portion calculated in the same manner as stated in paragraph 4. above. San Antonio (actually Texas) was to pay I. & G. N. the 3% per annum rental based on the valuation of this I. & G. N. trackage, payment to be made in monthly installments of 1⁄12th of such 3%, and was to pay 1⁄2 of any taxes.

6. San Antonio (actually Texas) and I. & G. N. were to alternate in actually operating for both Texas and I. & G. N.

over the jointly operated trackage, I & G. N. handling operations one year and San Antonio (actually Texas) the next year, and so on. In the year San Antonio (actually Texas) operated, I. & G. N. paid it $4.50 for each car handled for I. & G. N.; and if I. & G. N. operated, Texas would pay I. & G. N. $4.50 for each car handled for Texas.

7. Any industry tracks off of the eastward extension were to be built and paid for by San Antonio and any tracks off of the westward extension were to be built and paid for by I. & G. N. Such spurs would then come under the terms of the agreement the same as the original extensions provided for in the agreement. There were such spur tracks built from time to time.

8. Article I, Section 2, provides:

"San Antonio Company hereby grants to the International Company the right to operate its switching locomotives and cars upon the track to be constructed by the San Antonio Company as described in Section 1 of this Article I, for the purpose of serving such industries as may from time to time be located adjacent to said track or adjacent to the tracks connecting therewith; such right of use shall be in common with the San Antonio Company, its successors or assigns, and shall be carried out in the manner and under the terms and conditions herein set forth."

9. Article I, Section 3(a) provides:

"The International Company hereby grants to the San Antonio Company the right to operate its switching locomotives and cars upon * * * its industrial lead track * * * to a connection with the track of the Trinity Portland Cement Company * * * together with all of the International Company's tracks connecting with the tracks owned by Trinity Portland Cement Company * * * such right of use shall be in common with the In-

ternational Company, its successors and assigns, and shall be carried out in the manner and under the terms and conditions herein set forth."

10. Article XI, Section 2, provides:

"This agreement shall inure to the benefit of and be binding upon the parties hereto and their successors in title to the joint tracks herein described, forever."

These represent the portions of the agreement which we consider to be relevant to this decision.

This agreement was approved by the I. C. C.

Under Section 1(18), 49 U.S.C.A., it was necessary for a railroad to obtain a certificate of public convenience and necessity to either construct an extension, or, to operate over an extension, or, to construct an extension and operate over it. In its decision granting the joint application of San Antonio, Texas and I. & G. N., the I. C. C. observed that while the agreement provided for operation by San Antonio, it presumed actual operation was to be by Texas. It then made these findings of fact:

1. "Public convenience and necessity require *construction*" by San Antonio. (Emphasis ours.)

2. "Public necessity and convenience *require operation*" by Texas. (Emphasis ours.)

3. "Public convenience and necessity require *construction and operation*" by I. & G. N. (Emphasis ours.)

Then followed the grant of a certificate to San Antonio to *construct* the extension, the grant to Texas to *operate* over the extension, and the grant to I. & G. N. to *construct and operate* in accordance with the agreement.

Following the completion of the facilities authorized by I. C. C., I. & G. N. and Texas, in accordance with the agreement, were the only companies who operated over

the tracks until about 1954. Texas was lessee of San Antonio until 1934, when it acquired all the properties of San Antonio. Thereafter it operated as owner over the tracks.

During 1948, I. & G. N., Belt, Santa Fe, Chicago, Ft. Worth, and several companies which are now a part of Missouri, entered into an operating agreement under the terms of which Belt was to perform all switching operations for the other companies in and around the City of Houston. I. & G. N. had theretofore done its own switching operations. The agreement contained a lease of I. & G. N. trackage to Belt. The agreement was submitted to I. C. C. for approval. Texas, on learning that one of the parties other than I. & G. N. was contending that the agreement would give the other parties the right to use for their own account the Texas-owned track covered by the 1929 agreement, intervened before I. C. C. I. C. C. approved the agreement. In its opinion, I. C. C. questioned the right of the other parties to use such Texas-owned tracks, but did not pass upon the matter, holding that this was a matter to be determined by the courts. The agreement became effective June 1, 1950. It was sometime after the effective date of this agreement that the question came up regarding whether the parties to the 1948 agreement other than I. & G. N. could use the Texas-owned extension.

Texas concedes the right of Missouri to use the tracks because it is successor in title to I & G. N. It also concedes the right of Belt to use such tracks when acting as agent for Missouri. It denies, however, the right of Belt to use such tracks when operating for its own account or as agent for the defendants other than Missouri. The position of Texas is that the contract gave Texas and I. & G. N., or their successors in title to the I. & G. N. tracks, the right to operate over the Texas-owned extension, but I. & G. N. could not enjoy the right for itself and at the same time confer a like privilege on others, thus multiplying the beneficiaries.

The appellees contend that the contract gave I. & G. N. a license which was assignable, and also that Texas and I. & G. N. had from 1929 to 1934 placed an interpretation on the contract which is binding; that is, that Texas, being merely a lessee from San Antonio, had a right to operate over the I. & G. N.-owned track, and since Belt is a lessee of I. & G. N., it has the right to operate over the Texas-owned track for its own account and for the account of all other defendants.

The trial court sustained the position of the defendants, grounding its judgment upon the proposition that since Texas, as lessee, had operated under the 1929 agreement until it became owner in 1934, Texas and I. & G. N. interpreted the agreement as authorizing operation by a lessee.

We have concluded that the trial court was in error and that its judgment must be reversed and rendered.

■ Texas, San Antonio and I. & G. N. were all parties to the agreement. Texas, though a lessee, and I. & G. N. were the only operating companies. The factor of significance is not that Texas, at the time the contract was signed, was a lessee, but that it was within the contemplation of the parties that there would be two operating companies who would use the San Antonio extension, that is, Texas, which, until the agreement, had sole operating rights over San Antonio tracks, and I. & G. N. The intention of the parties as reflected by the agreement is controlling in the interpretation of contracts.

The agreement contained a grant by San Antonio to I. & G. N. alone to use the eastward extension of San Antonio tracks. Nowhere is there any grant to the assigns or lessees of I. & G. N. The same paragraph of the agreement which contains the grant to I. & G. N. provides that I. & G. N. shall have such right of use in common with San Antonio, its successors and assigns.

The agreement contains a grant by I. & G. N. to San Antonio to use I. & G. N.'s tracks to the west of the Cement Company tracks. No grant is given to San Antonio's assigns. However, the important factor here is that Texas was actually a party to the agreement and was the sole operating company for San Antonio. Too, the joint application filed with the I. C. C. showed it was contemplated by all parties that San Antonio would not operate over the eastward extension but would only construct it. The only authority granted by the I. C. C. to San Antonio was to construct the extension. I. C. C. gave only Texas and I. & G. N. the right to operate. Significantly, two operating companies were given the right by I. C. C. and the agreement, to operate over the tracks.

This conclusion is strengthened when we read Article XI, Sec. 2 of the Agreement. It provides, "This agreement shall inure to the benefit of and be binding on the parties hereto and their successors in title to the joint tracks herein described, forever." Had the grants above noticed been to the assigns of I. & G. N., there would be no need in the agreement of this provision.

Article I, Section 2 had given I. & G. N. the right to operate over the eastward extension in common with San Antonio (actually Texas), its successors and assigns, but the successors and assigns of I. & G. N. had been granted no such right. The same is true of the grant by I. & G. N. to San Antonio (actually Texas). I. & G. N. bound its successors and assigns to allow San Antonio (actually Texas) to use the tracks, but did not, except as to Texas, grant such right to assigns of San Antonio.

To protect those who succeeded to the rights of San Antonio, Texas and I. & G. N., Article XI, Sec. 2, was added and it limits the right to use the eastward extension to the *"successors in title"* to I. & G. N. tracks. (Emphasis ours.)

Too, the agreement provided for a 50-50 division of taxes, maintenance costs and rental. Further, the agreement provides for operation over the tracks in alternate years by San Antonio and I. & G. N. All

of these provisions reflect an intention by the parties to the agreement to allow operation only by Texas as operator for San Antonio and I. & G. N., or their successors in title to the joint tracks. Nothing evidences an intention to allow one of the parties to retain the right to operate in part for its own account and at the same time assign the right to operate and thus multiply the beneficiaries.

There is little authority on this subject, but such as there is, we find to support our conclusion.

In the case of Texarkana & Ft. S. Ry. Co. v. Texas & N. O. R. Co., 28 Tex.Civ. App. 551, 67 S.W. 525, 527, it appeared that T. & N. O. and Beaumont Lumber Company together built a spur track into the lumber company's property for the purpose of bringing freight in and out of the lumber company property. Thereafter Texarkana & Ft. S. Ry. Co. and Beaumont Wharf and Terminal Company sought to use this spur. T. & N. O., among other things, sought to enjoin such use. The trial court enjoined Texarkana & Ft. S. Ry. Co. from using the track but refused to enjoin Beaumont Wharf and Terminal Company. Such refusal seems to have been based on the fact that Beaumont Lumber Company gave the Wharf Company permission to use the spur. The Court of Civil Appeals, in holding this to be error, said:

"The Beaumont Wharf & Terminal Company, in its answer, seeks to justify its use of the spur track on the ground that the lumber company had granted it permission to do so. There is no fact in the findings of fact supporting the plea, but, if there had been proof of such permission having been granted, we do not think it would have been any defense to the action. The agreement between the lumber company and the railroad company precludes the idea that any power resided in the first-named company to grant other railroads the privilege of using the spur track built by it and the rail-

road company. The primary object of the construction of the spur track was to furnish the lumber company easy access to the main track of the railroad company, and while the former might have the right to have its lumber carried over said switch by the Texas & New Orleans Railroad Company, to be delivered to other railways, it could not authorize such other railways to invade the track built and intended for the sole use of the parties to the contract."

In the case of Coney Island & B. R. Co. v. Brooklyn Cable Co., 53 Hun 169, 6 N.Y.S. 108, it appeared that Coney Island R. R. Co. granted to Park Avenue Railroad Company and its assigns the right to use a track of the Coney Island Company on Water Street between Main and Fulton. Through various consolidations and transfers Atlantic Avenue Railroad Company succeeded to the rights of Park Avenue R. R. Co. This company operated its cars over the Water Street track and attempted to grant a concurrent right to the other defendants. The court enjoined the defendants from such use, holding that Atlantic Avenue Co. could not exercise the right and at the same time authorize others to use the track. The trial court said:

"'I do not think the agreement of 1871 was designed to give more than one company the right to make use of the plaintiff's railway. The contract ran to the Park-Avenue Railroad Company "and its assigns." This did not mean that the Park-Avenue Railroad Company could retain the right itself, and bring in any number of other companies to share the privilege with it. It could keep the right, or it could part with it by assignment; but it could not retain the right itself, and multiply the beneficiaries.'"

On appeal, the judgment of the trial court was affirmed and the court used this language:

"This general term in February last passed upon a case in many respects

similar to this, in which it was held that under such a contract the party hiring a right to run upon the tracks of another railroad could keep the right, or part with it by assignment, but it could not retain the right itself, and multiply the beneficiaries. The contract here is a mere license or privilege for hire. It is not a lease conveying an interest in the realty, but an agreement containing mutual stipulations in the nature of a license. It is clear the intent was to permit the first licensee to run its cars over the tracks mentioned. Had it been designed to cover any more than such a privilege, other terms would have been used to indicate such an intention. It seems unreasonable to say that such an agreement can be divided up into a large number of parts, so as to increase the use of the tracks many fold, and still the compensation remain at the same fixed price. Again, the covenants in the agreement about time-tables indicate that but one party was intended to use the road under the agreement. The word 'assigns' was used in the agreement to cover the case of the Park-Avenue Railroad selling out all its franchises, so that its assignees would succeed to its rights under the agreement. It was not used in the sense of giving a right to sublet or to convey a privilege to other parties to use the track while the Park-Avenue road retained the right to use them."

See also Elliott on Railroads, 3d Ed., Section 516, pp. 750–752.

In this case the grant was not expressly to the assigns of I. & G. N. It was only to I. & G. N. and their successors in title to the joint track. We are confident in the conclusion that the agreement gives no right to I. & G. N. to keep the right to use the track either by itself or through an agent and at the same time authorize other railroads to use it.

Appellees contend that from 1929 to 1934 Texas and I. & G. N. had interpreted the contract in such a way as to allow operation over the tracks by Belt and the other defendants. We do not agree with such contention.

As previously stated, the agreement contemplated operation by Texas and I. & G. N. These were the only companies that did in fact operate over the extension. In such operation each operated for its own account. There were no other beneficiaries. At no time prior to 1950 did the question ever arise as to whether the agreement allowed use of the extension by multiple beneficiaries. In 1950, Mr. Craft, Executive Vice President of Texas, wrote the executives of defendants, and in this letter asserted that only I. & G. N. could use this extension and the team track which could be reached only by use of the eastward extension. Mr. Cowley, President of Belt and Vice President of Santa Fe, answered this letter in 1950 in which he acknowledged that Mr. Craft's position might legally be correct and stated until Texas was notified to the contrary Belt would use the extension only as agent of I. & G. N. From time to time it was suspected by Texas that Belt was using the extension for others than I. & G. N. Such use could not be confirmed except in case of one car in 1954. On discovery of this, the waybill was delivered to I. & G. N. There was other correspondence between the parties, not necessary to detail, in which Texas consistently denied the right of anyone other than I. & G. N., or Belt as its agent, to use the extension or team track without interchange with either Texas or I. & G. N. with payment of the requisite switching charges.

It further appears that in 1951 Missouri issued a circular which showed firms served directly by railroads and showing which railroad served the firms. This circular listed the Lockwood team track of I. & G. N. and Texas which could be reached only by use of San Antonio's extension, and showed it was restricted to road haul traffic of I. & G. N. and Texas. Another circular issued by Missouri showed such to be restricted to road haul traffic of I. & G. N.

and Texas, but stated it was served by Belt switch engines when Belt acted as agent of I. & G. N. The sign on the team track showed the track to be jointly owned by Texas and I. & G. N.

We fail to find any evidence of probative force showing an interpretation of the agreement by the parties authorizing use of the San Antonio extension by anyone except I. & G. N. or Belt acting as its agent.

Appellees contend, however, that this suit may not be maintained because Texas has shown no damage.

This is a suit for a declaratory judgment under Article 2524–1, Vernon's Ann.Civ.St. Under this statute our courts are empowered to declare rights and other legal relations whether or not other relief is asked. Texas owns railroad trackage, which is property. Subject to lawful regulation by government, it has the right to preclude use of it by others. It has asked us to determine whether an agreement to which it is a party has granted to appellees the right to use its property. To that question, under the statute, it is legally entitled to an answer without showing of damage.

It should also be noted, however, that while no specific damage measured monetarily was shown, the evidence does show the very definite possibility of loss to Texas if appellees other than Missouri and Belt, acting as its agent, are permitted to use the extension. The team track of Texas and I. & G. N., which can be reached only through use of the San Antonio extension, is a local facility of a carrier used by the general public for receipt and delivery of freight. It is not open to use by other carriers. If an interstate shipment comes to Houston over other railroads than Texas or Missouri, the car containing it cannot legitimately be placed on the team track. If the shipment is intrastate, it can be placed on the team track only if the shipper or consignee pays a switching charge over and above the line haul costs. It is readily apparent that this gives the owner of the team track (Texas and Missouri) a definite advantage in soliciting freight which it would not have if the other defendants can use the track without charge.

Direct service is greatly desired by firms served by carriers. If a shipper ships by appellees other than Missouri and routes the shipment for delivery to Texas, as they may do, such appellees must interchange the car to Texas and pay a reciprocal charge to Texas. If appellees have the right to use the extension as an assignee of I. & G. N., then Texas could not collect such charge.

The judgment of the trial court is reversed and judgment is now here rendered declaring that appellees other than Missouri, and Belt, acting as agent of Missouri, have no right under said agreement of November 18, 1929, to use such eastward extension or industry tracks connected therewith.